Daniel Sadeh, Esq.
**HALPER SADEH LLP**
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MAURICIO GONZALES,<br><br>    Plaintiff,<br><br>v.<br><br>NIELSEN HOLDINGS PLC, JAMES A. ATTWOOD, JR., DAVID KENNY, THOMAS H. CASTRO, GUERRINO DE LUCA, KAREN M. HOGUET, JANICE MARINELLI MAZZA, JONATHAN MILLER, STEPHANIE PLAINES, NANCY TELLEM, and LAUREN ZALAZNICK,<br><br>    Defendants. | Case No:<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Mauricio Gonzales ("Plaintiff"), by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys.

**NATURE OF THE ACTION**

1.    This is an action against Nielsen Holdings plc ("Nielsen" or the "Company") and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections

1

14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9, in connection with the proposed acquisition (the "Proposed Transaction") of Nielsen by a private equity consortium (the "Consortium") led by Evergreen Coast Capital Corporation ("Evergreen"), an affiliate of Elliott Investment Management L.P. ("Elliott"), and Brookfield Business Partners L.P. together with its institutional partners (collectively, "Brookfield").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and 78t(a)) and Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as a substantial portion of the transactions and wrongs complained of herein had an effect in this District, the alleged misstatements entered and the subsequent damages occurred in this District, and the Company conducts business in New York City.

5. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

6. Plaintiff is, and has been at all relevant times hereto, an owner of Nielsen common stock.

7. Defendant Nielsen, together with its subsidiaries, operates as a measurement and data analytics company worldwide. The Company is incorporated in England and Wales. The Company's common stock trades on the New York Stock Exchange under the ticker symbol, "NLSN."

8. Defendant James A. Attwood, Jr. ("Attwood") is Chairman of the Board of the Company.

9. Defendant David Kenny ("Kenny") is Chief Executive Officer and a director of the Company.

10. Defendant Thomas H. Castro ("Castro") is a director of the Company.

11. Defendant Guerrino De Luca ("De Luca") is a director of the Company.

12. Defendant Karen M. Hoguet ("Hoguet") is a director of the Company.

13. Defendant Janice Marinelli Mazza ("Mazza") is a director of the Company.

14. Defendant Jonathan Miller ("Miller") is a director of the Company.

15. Defendant Stephanie Plaines ("Plaines") is a director of the Company.

16. Defendant Nancy Tellem ("Tellem") is a director of the Company.

17. Defendant Lauren Zalaznick ("Zalaznick") is a director of the Company.

18. Defendants Attwood, Kenny, Castro, De Luca, Hoguet, Mazza, Miller, Plaines, Tellem, and Zalaznick are collectively referred to herein as the "Individual Defendants."

19. Defendants Nielsen and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. The Proposed Transaction

20. On March 29, 2022, Nielsen announced that it had entered into a definitive agreement to be acquired by the Consortium for $28.00 per share in an all-cash transaction. The press release announcing the Proposed Transaction states, in pertinent part:

**Nielsen Enters into Agreement to be Acquired by Evergreen- and Brookfield-Led Consortium for $16 Billion**

NEWS PROVIDED BY
**Nielsen Holdings plc**
Mar 29, 2022, 07:30 ET

*Shareholders to receive $28 per share*

*60% premium to Nielsen's unaffected stock price*

*Nielsen to commence 45-day go-shop period*

*Transformative Nielsen ONE product rollout remains on track*

NEW YORK, March 29, 2022 /PRNewswire/ -- Nielsen Holdings plc (NYSE: NLSN) ("Nielsen") today announced that it has entered into a definitive agreement to be acquired by a private equity consortium ("Consortium") led by Evergreen Coast Capital Corporation ("Evergreen"), an affiliate of Elliott Investment Management L.P. ("Elliott"), and Brookfield Business Partners L.P. together with institutional partners (collectively "Brookfield") for $28 per share in an all-cash transaction valued at approximately $16 billion, including the assumption of debt.

\*   \*   \*

The Consortium has secured fully committed debt and equity financing, including an approximately $5.7 billion equity commitment from the Consortium consisting of Evergreen and Brookfield. There are no financing conditions to the closing of the transaction.

The transaction is subject to approval by Nielsen shareholders, regulatory approvals, consultation with the works council and other customary closing conditions. The transaction will also be subject to UK court approval pursuant to a scheme of arrangement. Alternatively, pursuant to the agreement, the parties may elect instead to complete the transaction pursuant to an agreed-upon tender offer. If

4

the closing conditions are met, the transaction is expected to close in the second half of 2022.

The Company no longer intends to commence share repurchases under the Board's previously approved authorization.

**"Go-Shop" Period**

The transaction agreement provides for a "go-shop" period, during which Nielsen – with the assistance of its financial advisors, J.P. Morgan and Allen & Company, and its legal advisors – will actively solicit, evaluate and potentially enter into negotiations with parties that offer alternative acquisition proposals. The go-shop period expires 45 days after Nielsen's entry into the transaction agreement. Following that period, Nielsen will be permitted to continue discussions and enter into or recommend a transaction with any person or group that submitted a qualifying proposal during the 45-day period, if the Board determines the proposal is superior to this transaction. A competing bidder who makes a superior proposal would bear a $102 million (1% percent of equity value) termination fee that is payable by Nielsen if Nielsen terminates the transaction agreement with the Consortium to accept such superior proposal.

**Advisors**

J.P. Morgan and Allen & Company LLC are acting as lead financial advisors to Nielsen. PJT Partners is also acting as an advisor to Nielsen. Wachtell, Lipton, Rosen & Katz, Clifford Chance LLP, DLA Piper, and Baker McKenzie are serving as legal advisors to Nielsen. Gibson, Dunn & Crutcher LLP and Herbert Smith Freehills LLP are serving as legal advisors to Evergreen and the Consortium, and Davis Polk & Wardwell LLP is acting as legal advisor to Brookfield. BofA Securities, Barclays, Credit Suisse, Mizuho Securities USA LLC, HSBC Securities (USA) Inc., and Citi are serving as financial advisors to Evergreen and Brookfield. Debt commitments to Evergreen and Brookfield were provided by Bank of America, Barclays, Credit Suisse, Mizuho Securities USA LLC, HSBC Bank USA National Association, KKR Capital Markets, Citi, Nomura Securities International Inc., and Ares Capital Management LLC.

21. On May 19, 2022, Defendants caused to be filed with the SEC a Schedule 14A Preliminary Proxy Statement (the "Proxy Statement") pursuant to Section 14(a) of the Exchange Act in connection with the Proposed Transaction.

**B. The Proxy Statement Contains Materially False and Misleading Statements and Omissions**

22. The Proxy Statement, which recommends that Nielsen shareholders vote in favor

5

of the Proposed Transaction, omits and/or misrepresents material information concerning: (i) Nielsen's financial projections; (ii) the financial analyses performed by the Company's financial advisors, J.P. Morgan Securities LLC ("J.P. Morgan") and Allen & Company LLC ("Allen & Company"), in connection with their fairness opinions; (iii) the sales process leading up to the Proposed Transaction; and (iv) potential conflicts of interest involving Company insiders.

23. The omission of the material information (referenced below) renders the following sections of the Proxy Statement false and misleading, among others: (i) Background of the Acquisition; (ii) Recommendation of the Board and Reasons for the Acquisition; (iii) Opinion of J.P. Morgan Securities LLC; (iv) Opinion of Allen & Company LLC; and (v) Management Projections.

24. Unless and until the material misstatements and omissions (referenced below) are remedied before the anticipated shareholder vote on the Proposed Transaction, Nielsen shareholders will be forced to make a voting decision on the Proposed Transaction without full disclosure of all material information. In the event the Proposed Transaction is consummated, Plaintiff may seek to recover damages resulting from Defendants' misconduct.

   **1. Material Omissions Concerning Nielsen's Financial Projections**

25. The Proxy Statement omits material information concerning Nielsen's financial projections.

26. With respect to Nielsen's financial projections, the Proxy Statement fails to disclose: (1) all line items underlying the projections; and (2) a reconciliation of all non-GAAP to GAAP metrics.

27. The disclosure of this information is material because it would provide the Company's shareholders with a basis to project the future financial performance of Nielsen and would allow shareholders to better understand the financial analyses performed by the Company's

6

financial advisors in support of their fairness opinions. Shareholders cannot hope to replicate management's inside view of the future prospects of the Company. Without such information, which is uniquely possessed by Defendant(s) and the Company's financial advisors, the Company's shareholders are unable to determine how much weight, if any, to place on the Company's financial advisors' fairness opinions in determining whether to vote for or against the Proposed Transaction.

28.     When a company discloses non-GAAP financial metrics in a Proxy Statement that were relied upon by its board of directors in recommending that shareholders exercise their corporate suffrage rights in a particular manner, the company must also disclose, pursuant to SEC Regulation G, all projections and information necessary to make the non-GAAP metrics not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial metrics disclosed or released with the most comparable financial metrics calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.[1]

29.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

### 2. Material Omissions Concerning the Financial Advisors' Analyses

30.     In connection with the Proposed Transaction, the Proxy Statement omits material

---

[1] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html (footnotes omitted) (last visited June 1, 2022) ("And last month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.").

information concerning analyses performed by J.P. Morgan and Allen & Company.

31.     The valuation methods, underlying assumptions, and key inputs used by J.P. Morgan and Allen & Company in rendering their purported fairness opinions must be fairly disclosed to the Company's shareholders. The description of the financial advisors' fairness opinions and analyses, however, fail to include key inputs and assumptions underlying those analyses.

32.     Without the information described below, the Company's shareholders are unable to fully understand J.P. Morgan's and Allen & Company's fairness opinions and analyses, and are thus unable to determine how much weight, if any, to place on them in determining whether to vote for or against the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

**A.  *J.P. Morgan's Analyses***

33.     With respect to J.P. Morgan's "*Public Trading Multiples*" analysis and "*Selected Transaction Analysis*," the Proxy Statement fails to disclose the individual multiples and financial metrics of each company and transaction J.P. Morgan observed in its analyses.

34.     The Proxy Statement fails to disclose the following concerning J.P. Morgan's "*Discounted Cash Flow Analysis*": (1) the terminal values of Nielsen; (2) the individual inputs and assumptions underlying the perpetual growth rates and discount rates used in the analysis; and (3) Nielsen's estimated 2021 fiscal year-end excess cash, minority interest, finance leases and total debt.

**B.  *Allen & Company's Analyses***

35.     With respect to Allen & Company's "*Selected Public Companies Analysis*" and "*Selected Precedent Transactions Analysis*," the Proxy Statement fails to disclose the individual

8

multiples and financial metrics of each company and transaction Allen & Company observed in its analyses.

36.     The Proxy Statement fails to disclose the following concerning Allen & Company's "*Discounted Cash Flow Analysis*": (1) the terminal values for Nielsen; and (2) the individual inputs and assumptions underlying the perpetual growth rates and discount rates used in the analysis.

37.     With respect to Allen & Company's analysis of forward Wall Street research analysts' price targets for Nielsen ordinary shares, the Proxy Statement fails to disclose: (1) the individual price targets observed by Allen & Company in its analysis; and (2) the sources thereof.

### 3. Material Omissions Concerning the Sales Process Leading up to the Proposed Transaction

38.     The Proxy Statement omits material information concerning the sales process leading up to the Proposed Transaction.

39.     The Proxy Statement provides that, "[o]ver the course of . . . 2020 and 2021, representatives of Nielsen periodically had discussions with representatives of Elliott and other investors to receive their views on Nielsen and its businesses and strategic alternatives pursuant to appropriate non-disclosure agreements, including, among other things, in relation to its potential spin-off and subsequent sale of its Global Connect business to affiliates of Advent International Corporation, which was consummated in March 2021."

40.     The Proxy Statement, however, fails to disclose all the terms of the Company's non-disclosure agreements, including whether such agreements contained standstill provisions and "don't ask, don't waive" (DADW) provisions (including their time of enforcement) that would preclude potentially interested parties from making superior offers for the Company.

41.     Without this information, the Company's shareholders may have the mistaken belief that potential buyers are or were permitted to submit superior proposals for the Company,

when in fact, they may be contractually prohibited from doing so. This information is material because a reasonable Nielsen shareholder would want to know, prior to voting for or against the Proposed Transaction, whether other potentially interested parties are or were foreclosed from submitting a superior proposal.

42. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

### 4. Material Omissions Concerning Company Insiders' Potential Conflicts of Interest

43. The Proxy Statement omits material information concerning potential conflicts of interest involving Company insiders.

44. The Proxy Statement fails to disclose the details of all employment-related and compensation-related discussions and negotiations concerning the Company's officers and directors, including the parties to such communications, when they occurred, and the specific content discussed/communicated.

45. Any communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to shareholders. This information is necessary for shareholders to understand potential conflicts of interest of management and the Board. Such information may illuminate the motivations that would prevent fiduciaries from acting solely in the best interests of the Company's shareholders.

46. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

**COUNT I**
**For Violations of Section 14(a) and Rule 14a-9 Promulgated Thereunder**
**Against All Defendants**

47. Plaintiff repeats and realleges each and every allegation contained above as if fully

set forth herein.

48. During the relevant period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

49. Each of the Individual Defendants, by virtue of his/her positions within the Company as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a) of the Exchange Act. Defendants, by use of the mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use of their names to file and disseminate the Proxy Statement with respect to the Proposed Transaction. The Defendants were, at minimum, negligent in filing the materially false and misleading Proxy Statement.

50. The false and misleading statements and omissions in the Proxy Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.

51. By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

52. Because of the false and misleading statements and omissions in the Proxy Statement, Plaintiff is threatened with irreparable harm.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

53. Plaintiff repeats and realleges each and every allegation contained in the foregoing

paragraphs as if fully set forth herein.

54. The Individual Defendants acted as control persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their senior positions as officers and/or directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading Proxy Statement.

55. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Proxy Statement, and to correct promptly any public statements issued by the Company which were or had become materially false or misleading.

56. In particular, each of the Individual Defendants had direct and supervisory involvement in the operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. The Proxy Statement at issue contains the recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, the Individual Defendants were directly involved in the making of the Proxy Statement.

57. In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the Individual Defendants.

58. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

59. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, the Company's shareholders will be irreparably harmed.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to Company shareholders;

B. In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Declaring that Defendants violated Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder;

13

D. Awarding Plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E. Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 1, 2022

Respectfully submitted,

**HALPER SADEH LLP**

By: /s/ Daniel Sadeh
Daniel Sadeh, Esq.
Zachary Halper, Esq. (to be admitted *pro hac vice*)
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com
         zhalper@halpersadeh.com

*Counsel for Plaintiff*